UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| THOMAS DUBE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 8-165-B-K |
| | ) |
| MICHAEL BOYER, et al., | ) |
| | ) |
|     Defendants. | ) |

**MEMORANDUM OF DECISION[1]**

    Thomas Dube has brought this action against Michael Boyer and Ronald
Dunham, two game wardens employed by the Maine Department of Inland Fisheries and
Wildlife, alleging various violations of his civil rights under the United States
Constitution, as well as assorted tort claims.  The facts giving rise to the lawsuit arose
during a minor verbal confrontation between the wardens and Dube while Dube was
operating a snowmobile in Piscataquis County on March 10, 2007.  The defendants have
moved for summary judgment and Dube, rather than responding to the substance of the
motion, has moved to dismiss the case without prejudice pursuant to Rule 41(a)(2).
Boyer and Dunham object to any dismissal without prejudice, noting that they have
already successfully defended against this action on one prior occasion when they
obtained a ruling that the Piscataquis County Small Claims Court did not have
jurisdiction to hear the matter.   This case represents Dube's second attempt to sue them,
begun in the Piscataquis County Superior Court and removed to this Court by the
defendants in May 2008.  I will now grant the defendants' motion for summary judgment,
rendering moot Dube's own motion to dismiss.

---

[1]      Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge
Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

## Summary Judgment Standard

The defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id. I review the record in the light most favorable to Dube and I indulge all *reasonable* inferences in his favor. See Fiacco v. Sigma Alpha Epsilon Fraternity, 528 F.3d 94, 98 (1st Cir. 2008).

The fact that Dube is a pro se plaintiff does not free him from the pleading burden set forth in Rule 56. See Parkinson v. Goord, 116 F. Supp. 2d 390, 393 (W.D.N.Y. 2000) ("[P]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Marcello v. Maine, 489 F. Supp. 2d 70, 77 (D. Me. 2007). While Dube's complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), his pro se status does not shield him from Rule 56's operative provision under subsection (e) requiring the pleader to "set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e)(1).

**Undisputed Material Facts**

For purposes of ruling upon this motion, because Dube has failed to respond to the defendants' statement of material facts (Doc. No. 8), I accept those facts to the extent they are supported by record citations.[2]  Michael Boyer and Sgt. Ronald Dunham worked as game wardens for the Bureau of Warden Service in March 2007.   The Bureau is part of the Maine Department of Inland Fisheries and Wildlife.  Boyer was hired in January 2003.  Sgt. Dunham was hired in 1997.

A game warden's duties are defined by 12 M.R.S. § 10054 and include, among other things, the enforcement of laws and department rules pertaining to the registration and operation of snowmobiles, watercraft, and all-terrain vehicles.   Both Dunham and Boyer have satisfied all of the State of Maine's educational and training requirements for game wardens.  They graduated from Maine Criminal Justice Academy and the twelve-week Wardens' School.  These schools provide students with instruction on a broad variety of law enforcement topics, including the Maine Criminal Code, as well as the First and Fourth Amendments of the United States Constitution.

On March 10, 2007, Sgt. Dunham, Warden Boyer, and Warden Bruce Loring were patrolling Maine's Interconnected Trail System (ITS) as part of an Enforcement Detail near the Jo-Mary Lake Region in Piscataquis County, Maine.   All wore uniforms that identified them as game wardens.  Boyer and Dunham estimate that they checked between fifty and one hundred snowmobiles for registration compliance at one location that day.   Later they drove to an intersection on ITS 83.  Dunham drove the lead

---

[2]        The only record evidence in this case are the affidavits prepared by Boyer and Dunham and submitted in support of their statement of fact.

snowmobile in the group, Boyer the last snowmobile.  Dunham stopped his snowmobile a short distance beyond the intersection.

Both wardens noticed four other snowmobiles parked off the trail near the intersection.   One of the snowmobilers—later identified as Thomas Dube—was standing near one of the parked snowmobiles in the group of four.  Although Warden Boyer did not know who the four snowmobilers were, he waived hello to the group as a friendly gesture. Almost immediately after he did, one of the men—later identified as Thomas Dube—raised his arms and gave Boyer "the finger" with both hands while shaking his arms.  Boyer stopped his snowmobile and looked at the man who had just given him the finger.  At about the same time Boyer stopped, the man raised his arms a second time and gave Boyer the finger again with both hands while shaking his arms.

Warden Boyer did not know who this man was, and he had no idea why the man had given him the finger.  Since Boyer was about 30 feet away from the man, he lifted his helmet shield and asked the man what the problem was.  The man said, "I like you so much I just wanted to tell you you're number one."  Shortly after that, Sgt. Dunham walked over to Boyer, noticed that he looked perplexed, and asked him what was wrong.  Boyer replied, "That guy just flipped me off."  Dunham asked Boyer which of the men had done that and Boyer pointed to Thomas Dube standing next to one of the four snowmobiles parked off the trail near the intersection.

As the wardens looked toward the man Boyer identified, the man turned away and got on his snowmobile.  Because the man had given Warden Boyer the finger for no apparent reason, turned away when the wardens looked in his direction, and got back on his snowmobile, Sgt. Dunham suspected he might be under the influence of alcohol.

Dunham had investigated "probably hundreds" of people for operating under the influence of alcohol during his career.  In his experience the man's behavior was not normal.

Sgt. Dunham told Boyer that they should find out what the problem was so the two of them walked over to the man who had given Boyer the finger.  As they did, the man started his snowmobile.   When they got to where the man was parked, Sgt. Dunham asked him to turn off his snowmobile engine.   The man refused, telling the Wardens that he did not have to.  After several more requests and refusals, Warden Boyer pressed the "kill switch" on the man's machine in order to shut down the engine.  Sgt. Dunham asked the man what the problem was.  The man said that he had just wanted them to know that they were number one.  Sgt. Dunham asked the man his name and for his snowmobile registration.  The man refused, telling the Wardens that he did not have to tell or show them anything.  Although the Wardens spoke politely to the man, he was belligerent, hostile, and confrontational toward them as soon as they approached him.

Next, the man reached into a bag and took out two voice recorders.  Unable to get the first voice recorder working, he tried to operate the second recorder, but it did not appear to function either.  The man was wearing a helmet with a full-face shield, so the wardens were unable to see his face.  As he tried to get his voice recorders working, Sgt. Dunham asked the man several times to remove his helmet.  In response to each of Dunham's requests, the man refused.  Many of the intoxicated people Sgt. Dunham had dealt with in the past initially refused to remove their helmets when asked to do so because face shields help conceal the odor of alcohol. Consequently, the man's refusals

5

to remove his helmet increased Dunham's suspicion that the man might be under the influence of alcohol.

Sgt. Dunham repeated his requests for the snowmobile registration and identification.  Dube refused to provide them, even after Dunham explained that Maine law required snowmobilers to produce their registration on demand.  Sgt. Dunham asked who owned the snowmobile.  Dube refused to tell him.  By this time, he  had refused to respond with answers to every question Dunham had asked him.   The snowmobile had a dealer plate attached to the front of it.  Dube pointed to it, indicating he did not need to provide any further information than that.  Sgt. Dunham explained that he was nevertheless required to produce his registration for inspection upon demand because people steal dealer plates.  Dube still refused to produce it.

Dunham told Dube that he was not free to go and that he was being detained while he and Warden Boyer investigated him for disorderly conduct.  After additional requests for identification, Dube finally reached into his pocket, removed his wallet, took out his driver's license, and held it behind his helmet. Sgt. Dunham reached for the license, Dube would not hand it to him.  In order to read the license, Sgt. Dunham would have had to compromise his personal safety by getting too close to Dube, so he explained that the license had to be presented to him in-hand.  Dube refused.  After more requests, he finally handed Sgt. Dunham the license.

The license identified the man as Thomas N. Dube of Greene, Maine. He claimed that the snowmobile belonged to a dealership he owned in Greene.  Then he told the wardens that they had no right to stop him.  Next, Dunham and Boyer interviewed two of the four snowmobilers who had parked their machines in the same area Dube had parked

6

his.  One was Delbert Spencer, the other William Cleary.  Boyer thought they might have

been riding with Dube but they had not.  Both men told the wardens that  Dube had not

been riding with them, that his behavior had been "crazy" and that Dube's conduct

offended them.  After interviewing Spencer and Cleary, Sgt. Dunham and Warden Boyer

discussed the encounter.  After considering the surrounding circumstances, Sgt. Dunham

instructed Boyer to issue a summons to Dube for disorderly conduct under 17-A

M.R.S.A. § 501-A.  Boyer did so.  The issuance of a summons for disorderly conduct was

consistent with their training, education, and experience.  They concluded that Dube had

engaged in disorderly conduct under the following language of 17-A M.R.S.A. § 501-

A(1)(B):

> A person is guilty of disorderly conduct if he knowingly accosts, insults, taunts or
> challenges any person with offensive, derisive . . . gestures or other physical
> conduct, that would in fact have a direct tendency to cause a violent response by
> an ordinary person in the situation of the person . . . insulted, taunted or
> challenged.

After Boyer gave him the summons, Dube drove away on his snowmobile.  The entire

encounter between the wardens and Dube lasted no more than 15 minutes.  Later, the

wardens learned that District Attorney Christopher Almy's Office declined prosecution

on the ground there was insufficient evidence to support a criminal prosecution for

disorderly conduct.  To the best of their knowledge, Sgt. Dunham and Warden Boyer had

never met Thomas Dube at any time prior to their encounter with him on March 10, 2007.

Dube later sued Boyer and Dunham for money damages under State law in the

Piscataquis County Small Claims Court.  His claims against them were based on the

March 10, 2007, incident described in this case.  The Court held a hearing on Thursday,

October 4, 2007.  That was the first and only time the wardens saw Dube's face, since he

never took off his full-face shield helmet during their encounter on the trail.  An Assistant Attorney General (AAG) from the Maine Attorney General's Office represented the wardens in the small claims case.  The AAG moved to dismiss Dube's case on the ground that the court did not have jurisdiction over claims brought under the Maine Tort Claims Act.  Judge Stitham dismissed the case for that reason.

### Discussion

Dube has brought a three count complaint, asserting violations of both his First and Fourth Amendment rights under the United States Constitution.  On these undisputed facts the defendants assert that no constitutional violations have been identified and, further, even if there was a constitutional violation, they are entitled to qualified immunity.  (Mot. for Summary J., Doc. No. 9.)  I agree with the wardens.

Turning first to the Fourth Amendment claim, it is apparent that this brief encounter did not violate Dube's Fourth Amendment right to be free from an unreasonable search or seizure. [3]   Law enforcement officers may stop and detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be occurring, even if the officers lack probable cause.  United States v. Sokolow, 490 U.S. 1, 7 (1989).  Dube called attention to himself by gesturing to the wardens in the manner they describe.  That they then felt further investigation regarding Dube's state of mind was warranted was certainly based upon a reasonable suspicion.  One questions why an adult in full control of his faculties would

---

[3]      Dube also references a "malicious prosecution" claim arising under the United States Constitution.  While a civil tort of malicious prosecution exists under Maine law, it does not necessarily mean that Dube has stated a constitutional violation by these assertions.  See Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001).  As Dube has failed to respond to defendants' argument that he was neither arrested nor made subject to a charging document in a court of law, I conclude that this aspect of his claim has been abandoned.

deliberately antagonize wardens in such an outlandish fashion.  The suspicion that Dube

might be under the influence of intoxicants was indeed a reasonable one.  The brief

investigatory encounter, which did not result in an arrest or a serious restriction of Dube's

movements, was well within the confines of a "routine traffic stop" and did not violate

the Fourth Amendment.[4]

Dube's First Amendment claim centers around the notion that the wardens'

application of Maine's disorderly conduct statute to "detain, arrest and prosecute" him

violated his free speech rights under the First Amendment.   Dube was never arrested nor

was he ever prosecuted in connection with his conduct on the snowmobile trail.  He was

issued a summons, but the prosecuting authority concluded that no charging document

would issue.  Dube does not precisely identify what protected speech he claims was

"chilled" by the officers' brief investigatory detention.  Assuming that Dube had a First

Amendment right to remonstrate with the officers regarding the need to produce a

registration and driver's license, there is no evidence to suggest that his objections on that

score were the "but for" reason for the issuance of the summons.  Tatro v. Kervin, 41

F.3d  9, 18 (1st Cir. 1994).

To claim that Dube's conduct in raising the middle finger of both hands on his

extended arms in a return gesture following the wardens' friendly wave is somehow

deserving of First Amendment protection such that the officers would be prohibited from

investigating the situation further is simply untenable.  The entire incident was provoked

---

[4]     Dube may well have had in mind the case of State of Maine v. Brent McKeen, Aro-08-396, a case
scheduled to be argued in the Maine Law Court on January 13, 2009.  A Superior Court Justice ruled that
12 M.R.S. § 10353(2)(G), the statute that permitted game wardens to stop any all-terrain vehicle to check
registrations without articulable suspicion or probable cause, was unconstitutional.  (A similar provision of
the statute, § 10353(2)(H), allows the same conduct with regard to snowmobiles).  The State appealed the
Superior Court's ruling and that issue has not been resolved.  However, that case has nothing to do with
these facts, because these wardens clearly had reasonable grounds for the investigation they undertook.

by Dube's inexplicable conduct and the officers did not violate his First Amendment rights when they approached him to investigate further into the circumstances.  A brief investigatory stop and the resultant summons did not "chill" any First Amendment rights that Dube may possess, as evidenced by his two subsequent lawsuits and his personal decision to discontinue this lawsuit only because of "significant personal family issues" and the "current state of the economy," reasons not attributable to the wardens' conduct at all.  (Mot. to Dismiss, Doc. No. 10.)

**Conclusion**

Based upon the foregoing, the defendants' motion for summary judgment is granted because the undisputed material facts establish that no constitutional violation occurred.  The plaintiff's motion to dismiss is moot in light of the entry of judgment for the defendants.

*So Ordered.*

January  13 , 2009                                    /s/ Margaret J. Kravchuk
                                                       U.S. Magistrate Judge